1

2

3

4

5

6

7

8                    IN THE UNITED STATES DISTRICT COURT

9                   FOR THE EASTERN DISTRICT OF CALIFORNIA

10   LARRY MONDRAGON,

11              Petitioner,                No. 2: 10-cv-0362 GEB KJN P

12        vs.

13   MICHAEL MARTELL,

14              Respondent.              FINDINGS AND RECOMMENDATIONS

15   _____/

16   I.  Introduction

17              Petitioner is a state prisoner proceeding without counsel with a petition for writ of

18   habeas corpus pursuant to 28 U.S.C. § 2254.  In 1983 petitioner was convicted of second degree

19   murder.  Petitioner is serving a sentence of 20 years to life.

20              In the instant action, petitioner challenges the October 2008 decision by the

21   California Board of Parole Hearings ("BPH") finding him unsuitable for parole.  This was

22   petitioner's tenth subsequent suitability hearing.  (Dkt. No. 9-1, at 87 of 119.)  This action is

23   proceeding on the original petition filed by petitioner on February 11, 2010.  Petitioner alleges

24   that there was insufficient evidence to support the decision finding him unsuitable for parole.

25              After carefully considering the record, the undersigned recommends that the

26   petition be granted.

II.  Anti-Terrorism and Effective Death Penalty Act ("AEDPA")

In Williams (Terry) v. Taylor, 529 U.S. 362 (2000), the Supreme Court defined the operative review standard in a habeas corpus action brought pursuant to 28 U.S.C. § 2254. Justice O'Connor's opinion for Section II of the opinion constitutes the majority opinion of the court.  There is a dichotomy between "contrary to" clearly established law as enunciated by the Supreme Court, and an "unreasonable application of" that law.  Id. at 405.  "Contrary to" clearly established law applies to two situations:  (1) where the state court legal conclusion is opposite that of the Supreme Court on a point of law; or (2) if the state court case is materially indistinguishable from a Supreme Court case, i.e., on point factually, yet the legal result is opposite.

"Unreasonable application" of established law, on the other hand, applies to mixed questions of law and fact, that is the application of law to fact where there are no factually on point Supreme Court cases which mandate the result for the precise factual scenario at issue. Id. at 407-08.  It is this prong of the AEDPA standard of review which directs deference be paid to state court decisions.  While the deference is not blindly automatic, "the most important point is that an *unreasonable* application of federal law is different from an incorrect application of law....[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable."  Id. at 410-11 (emphasis in original).  The habeas corpus petitioner bears the burden of demonstrating the objectively unreasonable nature of the state court decision in light of controlling Supreme Court authority.  Woodford v. Viscotti, 537 U.S. 19 (2002).

"Clearly established" law is law that has been "squarely addressed" by the United States Supreme Court.  Wright v. Van Patten, 552 U.S. 120 (2008).  Thus, extrapolations of settled law to unique situations will not qualify as clearly established.  See e.g., Carey v. Musladin, 549 U.S. 70, 76 (2006) (established law not permitting state sponsored practices to

2

1  inject bias into a criminal proceeding by compelling a defendant to wear prison clothing or by

2  unnecessary showing of uniformed guards does not qualify as clearly established law when

3  spectators' conduct is the alleged cause of bias injection).

4      The state courts need not have cited to federal authority, or even have indicated

5  awareness of federal authority, in arriving at their decision.  Early v. Packer, 537 U.S. 3 (2002).

6  Nevertheless, the state decision cannot be rejected unless the decision itself is contrary to, or an

7  unreasonable application of, established Supreme Court authority.  Id.  An unreasonable error is

8  one in excess of even a reviewing court's perception that "clear error" has occurred.  Lockyer v.

9  Andrade, 538 U.S. 63, 75-76 (2003).  Moreover, the established Supreme Court authority

10  reviewed must be a pronouncement on constitutional principles, or other controlling federal law,

11  as opposed to a pronouncement of statutes or rules binding only on federal courts.  Early v.

12  Packer, 537 U.S. at 9.

13      However, where the state courts have not addressed the constitutional issue in

14  dispute in any reasoned opinion, the federal court will independently review the record in

15  adjudication of that issue.  "Independent review of the record is not de novo review of the

16  constitutional issue, but rather, the only method by which we can determine whether a silent state

17  court decision is objectively unreasonable."  Himes v. Thompson, 336 F.3d 848, 853 (9th Cir.

18  2003).

19      When reviewing a state court's summary denial of a claim, the court "looks

20  through" the summary disposition to the last reasoned decision.  Shackleford v. Hubbard, 234

21  F.3d 1072, 1079 n.2 (9th Cir. 2000).

22  III.  Discussion

23      A. Insufficient Evidence

24      Petitioner alleges that there was insufficient evidence to support the BPH's 2008

25  decision finding him unsuitable for parole.  Petitioner raised this claim in a habeas corpus

26  petition filed in the Contra Costa Superior Court.  (Dkt. Nos. 9-1, 9-2).  The Contra Costa

3

1    Superior Court issued a reasoned decision denying this petition.  (Dkt. 9-3).  The California

2    Court of Appeal and California Supreme Court issued orders summarily denying petitioner's

3    habeas petitions challenging the BPH's 2008 decision.  (Dkt. Nos. 9-6, 9-9.)  Accordingly, the

4    undersigned considers whether the denial of petitioner's claim by the Superior Court was an

5    unreasonable application of clearly established Supreme Court authority.

6              The Due Process Clause of the Fourteenth Amendment to the United States

7    Constitution prohibits state action that "deprive[s] a person of life, liberty or property without

8    due process of law."  U .S. Const. amend. XIV, § 2.  A person alleging a due process violation

9    must demonstrate that he or she was deprived of a protected liberty or property interest, and then

10   show that the procedures attendant upon the deprivation were not constitutionally sufficient.

11   Kentucky Dep't. of Corrs. v. Thompson, 490 U.S. 454, 459-60 (1989); McQuillion v. Duncan,

12   306 F.3d 895, 900 (9th Cir. 2002).  A protected liberty interest may arise from either the Due

13   Process Clause itself or from state laws.  Board of Pardons v. Allen, 482 U.S. 369, 373 (1987).

14   In the context of parole, the United States Constitution does not, in and of itself, create a

15   protected liberty interest in the receipt of a parole date, even one that has been set.  Jago v. Van

16   Curen, 454 U.S. 14, 17-21 (1981).  However, when a state's statutory parole scheme uses

17   mandatory language, it "'creates a presumption that parole release will be granted' when or

18   unless certain designated findings are made, thereby giving rise to a constitutional liberty

19   interest."  McQuillion, 306 F.3d at 901 (quoting Greenholtz v. Inmates of Neb. Penal, 442 U.S.

20   1, 12 (1979)).

21              Under California law, prisoners serving indeterminate prison sentences "may

22   serve up to life in prison, but they become eligible for parole consideration after serving

23   minimum terms of confinement."  In re Dannenberg, 34 Cal.4th 1061, 1078, 23 Cal.Rptr.3d 417

24   (2005).  Generally, one year prior to an inmate's minimum eligible parole release date, the Board

25   will set a parole release date "in a manner that will provide uniform terms for offenses of similar

26   gravity and magnitude in respect to their threat to the public."  In re Lawrence, 44 Cal.4th 1181,

4

1202, 82 Cal.Rptr.3d 169 (citing Cal.Penal Code § 3041(a)).  A release date will not be set,
however, if the Board determines "that the gravity of the current convicted offense or offenses, or
the timing and gravity of current or past convicted offense or offenses, is such that consideration
of the public safety requires a more lengthy period of incarceration...."  Cal.Penal Code §
3041(b).

California state prisoners who have been sentenced to prison with the possibility
of parole have a clearly established, constitutionally protected liberty interest in receipt of a
parole release date.  <u>Allen</u>, 482 U.S. at 377-78 (quoting <u>Greenholtz</u>, 442 U.S. at 12); <u>Irons v.
Carey</u>, 505 F.3d 846, 850-51 (9th Cir. 2007) (citing <u>Sass v. Cal. Bd. of Prison Terms</u>, 461 F.3d
1123, 1128 (9th Cir. 2006)); <u>Biggs v. Terhune</u>, 334 F.3d 910, 914 (9th Cir. 2003); <u>McQuillion</u>,
306 F.3d at 903.

In the context of parole proceedings, it is well established that inmates are not
guaranteed the "full panoply of rights" afforded to criminal defendants under the Due Process
Clause.  <u>See</u> <u>Pedro v. Or. Parole Bd.</u>, 825 F.2d 1396, 1398-99 (9th Cir. 1987).  Nonetheless,
inmates are afforded limited procedural protections. The Supreme Court has held that a parole
board's procedures are constitutionally adequate so long as the inmate is given an opportunity to
be heard and a decision informing him of the reasons he did not qualify for parole.  <u>Hayward v.
Marshall</u>, 603 F.3d 546, 560 (9th Cir. 2010) (quoting <u>Greenholtz</u>, 442 U.S. at 16).  As a matter of
state constitutional law, denial of parole to California inmates must be supported by "some
evidence" demonstrating future dangerousness.  <u>Hayward</u>, 603 F.3d at 562 (citing <u>In re
Rosencrantz</u>, 29 Cal.4th 616, 128, 128 Cal.Rptr.2d 104 (2002)); <u>see also</u> <u>In re Lawrence</u>, 44
Cal.4th 1181, 1191, 82 Cal.Rptr.3d 169 (2008) (recognizing  the denial of parole must be
supported by "some evidence" that an inmate "poses a current risk to public safety"); <u>In re
Shaputis</u>, 44 Cal.4th 1241, 1254, 82 Cal.Rptr.3d 213 (2008) (same).  "California's 'some
evidence' requirement is a component of the liberty interest created by the parole system of [the]
state," <u>Cooke v. Solis</u>, 606 F.3d 1206, 1213 (9th Cir. 2010), and compliance with this

1    evidentiary standard is, therefore, mandated by the federal Due Process Clause.  Pearson v.

2    Muntz, 606 F.3d 606, 611 (9th Cir. 2010).  Thus, a federal court undertaking review of a

3    "California judicial decision approving the ... decision rejecting parole" must determine whether

4    the state court's decision "was an 'unreasonable application' of the California 'some evidence'

5    requirement, or was 'based on an unreasonable determination of the facts in light of the

6    evidence.'"  Hayward, 603 F.3d at 562-63 (quoting 28 U.S.C. § 2254(d)(2)).

7            When assessing whether a state parole board's suitability decision was supported

8    by "some evidence," the analysis "is framed by the statutes and regulations governing parole

9    suitability determinations in the relevant state."  Irons, 505 F.3d at 851.  The court must

10   look to California law to determine what findings are necessary to deem a petitioner unsuitable

11   for parole, and then must review the record to determine whether the state court decision holding

12   that these findings were supported by "some evidence" or whether it constituted an unreasonable

13   application of the "some evidence" principle.  Id.

14           Title 15, Section 2402 of the California Code of Regulations sets forth various

15   factors to be considered by the Board in its parole suitability findings for murderers.  The

16   regulation is designed to guide the Board's assessment regarding whether the inmate poses an

17   "unreasonable risk of danger to society if released from prison," and thus whether he or she is

18   suitable for parole.  In re Lawrence, 44 Cal.4th at 1202, 82 Cal.Rptr.3d 169.  The Board is

19   directed to consider all relevant, reliable information available, including the circumstances of

20   the prisoner's:  social history; past and present mental state; past criminal history, including

21   involvement in other criminal misconduct which is reliably documented; the base and other

22   commitment offenses, including behavior before, during and after the crime; any conditions of

23   treatment or control, including the use of special conditions under which the prisoner may safely

24   be released to the community; and any other information which bears on the prisoner's suitability

25   for release.  15 Cal.Code Regs. § 2402(b).

26   ////

The regulation also lists several specific circumstances which tend to show suitability or unsuitability for parole.  15 Cal.Code Regs. § 2402(c)-(d).  Factors tending to show unsuitability include,

(1) The Commitment Offense.  The prisoner committed the offense in an especially heinous, atrocious or cruel manner.  The factors to be considered include:

(A) Multiple victims were attacked, injured or killed in the same or separate incidents.

(B) The offense was carried out in a dispassionate and calculated manner, such as an execution-style murder.

(C) The victim was abused, defiled, or mutilated during or after the offense.

(D) The offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering.

(E) The motive for the crime is inexplicable or very trivial in relation to the offense.

(2) Previous Record of Violence.  The prisoner on previous occasions inflicted or attempted to inflict serious injury on a victim, particularly if the prisoner demonstrated serious assaultive behavior at an early age.

(3) Unstable Social History.  The prisoner has a history of unstable or tumultuous relationships with others.

(4) Sadistic Sexual Offenses.  The prisoner has previously sexually assaulted another in a manner calculated to inflict unusual pain or fear upon the victim.

(5) Psychological Factors.  The prisoner has a lengthy history of severe mental problems related to the offense.

(6) Institutional Behavior.  The prisoner has engaged in serious misconduct in prison or jail.

(15 Cal. Code Regs. § 2402(c).)

Factors tending to show suitability include,

(1) No Juvenile Record.  The prisoner does not have a record of assaulting others as a juvenile or committing crimes with a potential of personal harm to victims.

(2) Stable Social History.  The prisoner has experienced reasonably stable relationships with others.

(3) Signs of Remorse.  The prisoner performed acts which tend to indicate the presence of remorse such as attempting to repair the damage, seeking help for or relieving suffering of the victim, or indicating that he understands the nature and magnitude of the offense.

(4) Motivation for Crime.  The prisoner committed his crime as the result of significant stress in his life, especially if the stress has guilt of a long period of time.

(5) Battered Woman Syndrome.  At the time of the commission of the crime, the prisoner suffered from Battered Woman Syndrome, as defined in section 2000(b), and it appears the criminal behavior was the result of that victimization.

(6) Lack of Criminal History.  The prisoner lacks any significant history of violent crime.

(7) Age.  The prisoner's present age reduces the probability of recidivism.

(8) Understanding and Plans for Future.  The prisoner has made realistic plans for release or has developed marketable skills that can be put to use upon release.

(9) Institutional Behavior.  Institutional activities indicate an enhanced ability to function within the law upon release.

(15 Cal. Code Regs. § 2402(d).)

The overriding concern is public safety, In re Dannenberg, 34 Cal.4th 1061, 1086, 23 Cal.Rptr.3d 417 (2005), and the focus is on the inmate's current dangerousness.  In re Lawrence, 44 Cal.4th at 1205, 82 Cal.Rptr.3d 169.  Thus, under California law, the standard of review is not whether some evidence supports the reasons cited for denying parole, but whether some evidence indicates that a parolee's release would unreasonably endanger public safety.  In re Shaputis, 44 Cal.4th 1241, 1254, 82 Cal.Rptr.3d 213 (2008).  Therefore, "the circumstances of the commitment offense (or any of the other factors related to unsuitability) establish unsuitability if, and only if, those circumstances are probative to the determination that a prisoner remains a danger to the public." In re Lawrence, 44 Cal.4th at 1212, 82 Cal.Rptr.3d 169.  In other words, there must be some rational nexus between the facts relied upon and the ultimate conclusion that the prisoner continues to be a threat to public safety.  Id. at 1227, 82 Cal.Rptr.3d 169.

////

1    Of note, in finding petitioner unsuitable for parole, the BPH relied primarily on

2 the commitment offense and petitioner's prior criminal record.  In particular, the BPH stated that

3 the offense was carried out in a cruel manner.  (Dkt. No. 9-2, at 60 of 115.)  The BPH further

4 found that the offense was carried out in a manner that demonstrated a disregard for human

5 suffering.  (Id.)  The BPH found that petitioner's motive for the crime was, in essence, trivial.

6 (Id.)  The BPH found that petitioner had an extensive prior criminal record, including convictions

7 as a juvenile.  (Id.)  In order to put these findings in context, the undersigned will set forth the

8 description of petitioner's criminal offense contained in the transcript from the 2008 suitability

9 hearing:

10    Presiding Commissioner Prizmich: But let me start on page 2
      under evidence, the evidence, prosecution case:

11

12    "The scene of the homicide was an apartment complex in
      Pittsburg.  A neighbor of Margaret Revera, R-E-V-E-R-A, was
      Linda Mondragon, M-O-N-D-R-A-G-O-N, defendant's estranged

13    spouse, Linda's brother, the victim Frank Delacruz, D-E-L-A-C-R-
      U-Z, also lived in the complex with Nancy Szendejaz Serna, S-E-

14    R-N-A."

15    And I'm not sure–I'm sure I botched the middle name, it's S-Z-E-N-D-E-
      J-A-Z, Serna.  What is it?  All right.  Nobody else is going to –

16

17    Deputy Commissioner Waddell: Szendejaz, I think it is.

      Presiding Commissioner Prizmich: Szendejaz, okay.  That sounds much
18    better.  Serna, I got that right I think.

19    "Revera would frequently watch Linda's four children, one of
      whom was the defendant's daughter, Yolanda.  Revera testified

20    that during the afternoon of September 12th, she watched Yolanda
      nearly knocked down on the cement, her two-year-old-sister.  At

21    that time, the defendant was standing next to his car in the parking
      lot.  Revera scolded Yolanda for sitting and pushing her younger –

22    the younger child.  When Yolanda refused to behave, Revera
      slapped her hand.  Yolanda looked at the defendant and began to

23    scream.  Defendant approached and asked Yolanda whether she
      had deserved to be slapped.  The child initially said yes, then said,

24    no, whereupon the defendant in a 'loud and mean' voice told
      Revera that she had no right to strike his daughter and said if she

25    ever 'touched' the child again, he would kill her.  Revera
      responded that if she watched the children for the defendant and

26    Linda, they had better expect that she would discipline them.

9

Defendant became enraged and called her 'all kinds of names.' About the time that the defendant drew back his hand as if to hit Revera, Linda Mondragon, who was quite intoxicated, going to page 3, came out of her apartment and stepped down between the two of them.  Defendant pushed Linda, causing both women to fall to the ground.  Revera and another woman named Sandra 'dragged' Linda, who was having trouble standing back to her apartment and placed her in a chair in the living room.  As Revera attempted to leave the apartment, the defendant stood in her way, repeating his threat to kill her if she struck his child.  When Revera screamed back at him, he struck her in the face.  At that point, Revera saw Delacruz standing in the doorway.  Revera stated that Delacruz appeared to have been 'drinking' but spoke with the defendant in a calm voice.  Revera slipped out of the apartment ran to her car.  And I guess that means apartment.  Inside her apartment, Revera changed her clothes, grabbed a stick, and then stood in her doorway.  There she saw the defendant walk over to her apartment followed by Delacruz.  Defendant was 'still angry' and told her that she had 'better not' touch his children.  Delacruz told the defendant to leave Revera alone.  The defendant continued to harangue Revera, and she called him a 'sissy.'  When defendant appeared to move towards Revera, Delacruz said, 'Why don't you learn to fight men instead of always hitting on women?'  At that point, the defendant turned to Delacruz and said, 'I've been waiting for your ass for a long time.'  Delacruz backed up.  The defendant walked toward him.  According to Revera, they started pushing each other, then the defendant went towards Delacruz's stomach like he was 'stabbing something.'  She then heard Delacruz scream that he had been stabbed.  After the stabbing, Eric Nunn, N-U-N-N, a bystander told his roommate Niecee, N-E-I-C-E-E, to get a crowbar from their apartment.  The woman returned shortly with a crowbar, handed it to Nunn, who then gave it to Delacruz.  According to Revera, the defendant was swinging the knife at the people in the crowd because 'the people were trying to figure out a way how they could get him.'  Defendant threatened to kill anyone who came close to him.  When Delacruz raised the crowbar, the defendant ran into Linda's apartment.  Delacruz slowly ran after him into the apartment.  Revera heard yelling from inside the apartment, then ran to summon police.  Nancy Serna testified that when the defendant pulled out his knife, Delacruz instructed her to go into their house and get a knife.  Unarmed, Delacruz pursued the defendant.  When she returned without the knife, he saw the defendant run into Linda's apartment.  When Delacruz followed in 'a daze' according to Serna, she could see he was hurt.  I'd seen some blood in the upper neck, and his movement was just slow.  Carrying a crowbar – continuing to page 5 – Delacruz followed the defendant into the kitchen, Serna also went inside the apartment.  Defendant picked up a chair with two hands and shoved Delacruz with it.  Delacruz fell down, dropping the crowbar.  At that point, according to Serna, 'Delacruz was out.  His eyes were shut.  He had no movement.  He didn't pick up the crowbar.  He did not

1
2
3
4
5
6

pickup the crowbar, no. He didn't try to get nothing, no.' The defendant then picked up the crowbar and while holding it in both hands, struck the victim twice in the head. Serna attempted to wrestle the crowbar away from the defendant. He jumped back and threatened to hit her with the crowbar. She grabbed her dog, a pit bull, and ran out of the apartment. Serna testified that Delacruz was mellow but did not seem drunk. She added, however, that he would drink constantly. She admitted that she drank frequently and that she was aggressive – an aggressive person. She had been convicted of forgery. She was in custody at the time of the trial and that she had recently been on a Methadone program."

7

I'll just read a bit more.

8
9
10
11
12
13
14
15
16
17

"Ike Daniels, D-A-N-I-E-L-S, testified that prior to the confrontation, Delacruz was fairly high from alcohol. He witnessed the defendant threaten to kill Revera on the steps of her apartment and saw Delacruz attempting to calm them. He testified that defendant told Delacruz to stay out of it because 'I'd been waiting to kick your ass for a long time.' Delacruz responded, 'Come on then. If you want to kick my ass, we can fight.' Delacruz also said something to the effect that someone else had already whipped the defendant's ass and that it was going to – he was going to finish you off. As the two men moved out to fight, Daniels saw defendant draw his knife, then saw Delacruz holding his bloodied stomach. After Delacruz walked quickly into the house after the defendant, Daniels left to telephone police. Daniels then stationed himself outside Linda's house so he could see through the door. He saw Delacruz holding a crowbar in the air. Defendant held a chair with both hands and struck Delacruz with it. Delacruz fell to the floor, dropping the crowbar. Daniels then saw the defendant swing the crowbar at the victim. He thought the defendant hit him with it. Delacruz was just laying there."

18

(Dkt. No. 9-1, at 101-06 of 119.)

19
20
21

The BPH discussed petitioner's prior criminal history at the hearing. This record is succinctly summarized in the Life Prisoner Evaluation prepared by Correctional Counselors for the 2008 suitability hearing:

22

II. PRE-CONVICTION FACTORS:

23

A. Juvenile Record:

24
25
26

Prisoner's first arrest was at age 16 for Truancy on 6/12/67 for which he received four (4) months informal probation. Nine (9) months later, Mondragon was arrested for a school burglary. While awaiting disposition, he committed two (2) residential and another school burglary. He was made a ward of the court. One (1) year later, he was arrested for

1    Possession of Hypodermic Needle, Curfew Violation, Attempted Escape,
     Runaway and Violating Court Orders. Sentencing included a Boys Ranch
2    commitment.  On January 19, 1970, wardship was vacated and the petition
     was dismissed.  Mondragon was again arrested at age 19 for the Burglary,
3    receiving six (6) months in county jail and three (3) years probation.  It
     appears that Mondragon was committed to the Youth Authority as an
4    adult.  Thirteen (13) months after this conviction, his disciplinary pattern
     escalated with law enforcement, being arrested for Petty Theft, Battery,
5    Disturbing the Peace, Battery on a Peace Officer or Fireman and Escape.
     Disposition ranged from six (6) month county jail to one year California
6    Youth Authority (CYA).

7        B.  <u>Adult Conviction</u>:

8    Prisoner had been paroled from CYA approximately one (1) week when he
     was arrested for Burglary and Receiving Stolen Property.  His arrests
9    increased in severity from Cultivating Marijuana, Assault with a Deadly
     Weapon on a Peace Officer, Manufacturing a Weapon (While in prison,
10   prior term), to Assault with a Deadly Weapon.  Each arrest resulted in a
     conviction of state prison with total terms ranging from six (6) months to
11   five (5) years and to (6) months to life.

12   (Dkt. No. 9-1, at 72-73 of 119.)

13        The undersigned will now address the other factors demonstrating suitability and

14   unsuitability discussed by the BPH in its decision.  Significantly, the BPH did *not* find that

15   petitioner's disciplinary prison record demonstrated unsuitability.  Rather, the BPH found that

16   petitioner's much improved disciplinary record was a positive factor in his favor:

17   In terms of your institutional behavior, you did, as so many inmates do,
     when they come in, had some timeframe adjustment – which is a kind of
18   way of putting you didn't conform initially.  It's obviously did a
     turnaround, and you're the only one that can make that turnaround.  You
19   made it.  You started working towards what we believe would be a more
     appropriate outlook in life and stopped getting the 115s and 128s.  But we
20   did consider those.  They were some time ago, and they actually work
     more in your favor as opposed to detriment against you.  You had six total
21   115s and nine 128s in this most recent prison commitment.

22   (Dkt. No. 9-2, at 60-61.)

23        Petitioner had six disciplinary convictions during his incarceration, the most

24   recent being from June 9, 1991.  (Dkt. No. 9-2, at 112 of 115.)  Petitioner had nine counseling

25   chronos, the last one from March 15, 2005 for disobeying an order.  (<u>Id</u>., at 15.)  Petitioner, who

26   is diabetic, had disposed of the lancet in the trash instead of turning it in.  (<u>Id</u>.)

1    In its decision, the BPH also noted that petitioner had positively programmed

2  while in prison:

3        Again, realizing that only you are going to get yourself out of this – this
         prison, you started programming.  You started getting your vocations.
4        You started working on what ultimately came to be your – your focus in
         life and that hopefully is your commitment to religion, and you've done a
5        lot of work on that, a man coming from as little educational background as
         you have are on the threshold of possibly getting an AA.

6

7  (Id., at 61.)

8    In 2007, petitioner received a certificate in the vocational small engine program.

9  (Id., at 7-8.)  Petitioner also had received a certificate in silk screening.  (Id., at 10-11.)  Petitioner

10 obtained his GED and almost had enough units for an AA degree in bible study.  (Id., at 119.)

11   Regarding the psychological report prepared for the 2008 hearing, the BPH stated,

12 "we find this most recent one as we do the last one was favorable."  (Id., at 62.)  A copy of the

13 psychological report is attached as an exhibit to respondent's answer.  (Id., at 70-83.)  The report,

14 prepared by Dr. Jack Pascoe, concludes,

15       Since Mr. Mondragon's last appearance before the BPH, he has
         maintained his pro-social attitude, positive disciplinary free behavior and
16       his active participation in self-help improvement through AA and
         educational correspondence bible study courses.  His parole plans appear
17       feasible and comprehensive.  His efforts to satisfy the recommendations
         made by the last BPH panel as desirable and necessary for future
18       considerations regarding parole are documented and appear satisfactory.
         *The current risk assessment comprised of results from two clinical*
19       *instruments along with an evaluative interview and review of available*
         *records indicates that he at this time represents a low risk of recidivism if*
20       *released to the community.*

21 (Id., at 82-83 (emphasis added).)

22   The BPH also found that petitioner had suitable parole plans and a supportive

23 family:

24       In terms of your parole plans, you're lucky to have a family that's willing
         to accept you back and be helpful to you, and we do not find any major
25       problems that we can talk to you about there.  You have some job offers.
         They seem to be viable. They're friends, so it's very likely that you will –
26       it's a job offer that you will get, and you have the job with the – it think it

1    was with C&H Sugar, but they all seem to be, in our estimation, viable.

2    (Id., at 62.)

3            Of further note, the only post-commitment factor the BPH relied on to find

4    petitioner unsuitable was his history of drug and alcohol abuse.  The BPH did *not* find petitioner

5    unsuitable because he had not adequately participated in treatment programs.  Rather, the BPH

6    found petitioner unsuitable because the BPH concluded petitioner had not made adequate plans

7    for obtaining alcohol treatment following his release on parole.  In order to make this clear, the

8    portion of the decision where this is discussed will be quoted below:

9            Presiding Commissioner Prizmich: The biggest area of concern we have,
        sir, is the crime itself involved alcohol or drug abuse or everybody was out
10       of sorts on that day, but it's something that you had participated in for
        some time.  You were engaged in alcohol and or drug abuse, and it's
11       something we're concerned with.  You should be concerned with, and one
        of the ways to allay our fears to allay anybody else that would look at what
12       we do, the governor's office or the Decision Review Unit, is to assure all
        those individuals that you are going to participate in an AA or some
13       program like that.  Now, I want to give you some suggestions on how to
        do that.  We're going to give you a one year denial.  We believe one year
14       is more than adequate time for you to get yourself set up.  If you chose not
        to, that's your choice, but I'm going to be clear with you as [I] possibly
15       can, and then from that point it will be your choice as to whether you
        accomplish what we think you need to do.  One, is if you are a committed
16       religious based-individual, then the first thing you're going to do is go to a
        church and establish a residency, in the sense of a spiritual residency at a
17       church.  We suggest that you seek out – Richmond has a number of them
        – seek out a church that has a 12-step program associated with that church.
18       Failing that, and that's unusual nowadays because most churches,
        especially if it's just Christian, non-denominational based have some form
19       of drug and alcohol counseling associated with them.  They are usually
        based on biblical principles.  They meet on a real regular basis.  If that's
20       your leaning, if that's what you think you want to do is stay in religious-
        based lifestyle, then we would suggest that you hook into a 12 step
21       program at your church.  Now, if you can't find one, which would be odd
        to me, if you can't find one, we are going to suggest that you identify –
22       now, you did a good job identifying alcohol programs, but they're usually
        – from what I could gather in looking at that list, it's going to cost you.
23       AA or NA, if you choose those, are free of charge.  I think they charge
        something for the coffee or something like that.  What we want you to do
24       is identify the AA programs that are in the area that you're going to be
        living.  Not because we want to see the boxes checked, the T's crossed or
25       the I's dotted. Those are important, but the reason we ask for that is that it
        forces you to look into it and to make an emotional and mental
26       commitment to that's what you're going to do.  We have a better feeling

1   that you're going to follow through on that than just saying I'm going to
2   go to an AA program.  That is nebulous.  That's meaningless.  It's just a
    statement.  But when you say I've got a [program] that meets seven days a
    week, three times a day.  I can pick one from any of these three meetings a
3   day.  We are located at 123 Maple Street, it's three blocks down the street.
    That tells us a lot more about your commitment than just saying, "I'm
4   going to an AA program."  Do you understand?

5   Petitioner: Yup.

6   Presiding Commissioner Prizmich: So, that's what we're going to want to
    see.  Now, we're not going to say you have to go to an AA program, and I
7   can put it  – if you got a date, I can put it in the granting information all I
    want, but what I'd like to have you do is come in and tell me that's what
8   you're going to do.  That's more important to me than just telling you
    that's what you're going to do.  There's a risk there.  There's less of a risk
9   if you tell me that's what you want to do.  So do it.  If it's religious-based,
    find one that religiously suits your needs, and I'll almost guarantee you –
10  you've got an AA gal out there that is in AA.  She does the 12 steps.  She
    can help you out on that.  Sounds like she's a religious person as well as
11  your family members.  They're religious. They can simply ask the
    minister, pastor, whatever they refer to him, is there an AA group
12  associated with this church, Yeah there is.

13  (Id., at 62-65)

14       In essence, the BPH found petitioner unsuitable because his failure to provide

15  them with a list of AA meetings in the area where he was to be paroled suggested that he had not

16  made a mental and emotional commitment to continuing his recovery from alcoholism following

17  his release on parole.

18       During the hearing, the BPH discussed with petitioner his attempts to obtain

19  information regarding alcohol treatment programs in Contra Costa County where he expected to

20  be paroled:

21       Presiding Commissioner Prizmich: No, it's just a – let me see the AA
         groups.  What do you got there?  Okay.  This has got the card.  The other
22       one didn't.  Thank you.  If I didn't mention it, it was May 15th, 2008.  So,
         okay.  Good.  And we've got a list of AA meetings at Contra Costa
23       County.  You've got some of those highlighted.  Why are they
         highlighted?
24
         Petitioner: Yeah, these are the ones that I wrote to.  This is the response
25       from the letter I wrote.

26       Presiding Commissioner Prizmich: Kaiser Permanente.

1    Petitioner: They sent a pamphlet to–

2    Presiding Commissioner Prizmich: Oh, to –

3    Petitioner: Because I asked them what they had going out there.

4    Presiding Commissioner: In Kaiser?

5    Petitioner: No, in Richmond.

6    Presiding Commissioner Prizmich: Well, this is – okay.  I'm not
7    getting it here.  You wrote to AA and Kaiser sent you something
     back?

8    Petitioner: No.  That's – right there where the thing that's sitting on the
     desk, those are placed out there that deal with AA, you know, alcoholics
9    and stuff.

10   Presiding Commissioner Prizmich: Oh, they just generally.  You're just
     using that as a general commentary.  So, one of the things was Kaiser?
11

12   Petitioner: Right.

13   Presiding Commissioner Prizmich: All right.  Got you.

14   Petitioner: And then the other one I sent, they returned to sender.

15   Presiding Commissioner Prizmich: Okay.

16   Petitioner: They didn't –

17   Presiding Commissioner Prizmich: All right.  And this is –

18   Petitioner: And the other one I send didn't – didn't respond.

19   Presiding Commissioner Prizmich: Okay.  So you sent three of them out?

20   Petitioner: Yeah, and I got one response.

21   Presiding Commissioner Prizmich: Okay.  Let me – so these are just
     general Contra Costa County drug and alcohol –

22   Petitioner: Yeah, I just concentrated on Richmond.

23   Presiding Commissioner Prizmich:  – various.  It's not AA.  AA is a
     separate group.
24

25   Petitioner: Yeah.  Yeah.

26   Presiding Commissioner Prizmich: Okay.

1    Petitioner: That was supposed to be AA, but it was a –

2    Presiding Commissioner Prizmich: Okay.  See, these are mostly pay-for
     kind of stuff. AA is free.
3
     Petitioner: I didn't know that.
4
     Presiding Commissioner Prizmich: AA, you just go to the meetings and
5    hang out.  Drink coffee, smoke cigarettes.

6    Petitioner: Well, I think there was a misunderstanding when we were
     talking to the sponsor.  She got these out of a –
7
     Presiding Commissioner Prizmich: Yeah, because you had a lady.  That
8    one lady, she's been a sponsor.

9    Petitioner: Um-hum.

10   Presiding Commissioner Prizmich: So she knows about the system.  What
     was her name?  Tracy Hill.
11
     Petitioner: Um-hum.
12
     Presiding Commissioner Prizmich: She probably goes to AA.
13
     Petitioner: Yeah, she runs a program out there.  She's a –
14
     Presiding Commissioner Prizmich: Okay.  Right.  I'm just saying that AA
15   or NA, they don't charge anything.

16   Petitioner: Right. Yeah, I understand that.  There's a bunch of them right
     there in Richmond.
17
     Presiding Commissioner Prizmich: Okay.  All right.
18
     Petitioner: AA's.
19

20   (Dkt. No. 9-2, at 38-40.)

21          The portion of the record quoted above clearly demonstrates that petitioner had

22   attempted to obtain information regarding drug treatment programs in Contra Costa County.

23   While he had successfully obtained information regarding drug treatment programs that were not

24   free, it appears that his requests for information regarding AA meetings were not responded to.

25   However, petitioner informed the BPH that there were "a bunch" of AA meetings in Richmond.

26          The transcript above demonstrates that petitioner had made a mental and

                                              17

emotional commitment to continuing his recovery from alcoholism following his release on parole.  His failure to obtain a list of AA meetings did not demonstrate that he was not sincere in his recovery.  Moreover, the undersigned does not doubt that there are "a bunch" of AA meetings in Richmond and that it is not difficult to find out when and where they are held.

After reviewing the record, the undersigned does *not* find that "some evidence" supported the 2008 decision by the BPH that petitioner's release would unreasonably endanger public safety.  In finding petitioner unsuitable, the BPH relied on the circumstances of petitioner's commitment offense, his prior criminal record, and his failure to obtain a schedule of AA meetings in Contra Costa County.  For the reasons discussed above, petitioner's failure to obtain a schedule of AA meetings was not indicative of his current dangerousness.

Although the circumstances of petitioner's commitment offense and his prior criminal record are indeed troubling, the undersigned finds that based on petitioner's years of positive prison programming and his realistic parole plans and strong family ties, the circumstances of petitioner's commitment offense and his prior criminal record were no longer probative to the determination of whether petitioner remained a danger to the public.  There was no rational nexus between the facts of petitioner's 1983 offense and his criminal history prior to that date and the fundamental question as to whether his release posed a threat to public safety in 2008.  The fact that the 2008 BPH ordered a one year denial (id., at 62) suggests that it also recognized the weakened relevance of petitioner's criminal history.  Rather, the record demonstrated that petitioner was suitable for parole based on the relevant law and regulations.

As discussed above, the Contra Costa Superior Court upheld the 2008 suitability decision of the BPH.  For the following reasons, the undersigned finds that this decision was an unreasonable application of clearly established Supreme Court authority.

The Superior Court found that the record demonstrated that petitioner remained a danger to the public.  In making this finding, the Superior Court relied on the commitment

1    offense and petitioner's prior record.  (Dkt. 9-3, at 5-6 of 12.)  The Superior Court also found that

2    petitioner's disciplinary record "was relevant to his unsuitability for parole."  (Id., at 8 of 12.)

3    However, as discussed above, the BPH did not rely on petitioner's prison disciplinary record in

4    finding him unsuitable.  The BPH stated that his failure to have received a prison disciplinary in

5    many years " work[s] more in your favor as opposed to detriment against you."  (Dkt. No. 9-2, at

6    60-61.)  Because this was not a ground relied on by the BPH in finding petitioner unsuitable, the

7    Superior Court was not entitled to rely on it.  Hatcher v. Carey, 2010 WL 3258578 at *3 (9th Cir.

8    Aug. 17, 2010) (unpublished) (citing In re Elkins, 144 Cal.App. 4th 475, 493 (Cal. Ct. App.

9    2006) (disregarding unsuitability circumstances not relied upon by Governor when reviewing

10   Governor's decision reversing Board's suitability finding).

11          The Superior Court also suggested that the BPH found that petitioner had not

12   participated in sufficient self-help programs while in prison:

13          Participation in therapy or self-help while incarcerated is a criterion for
             suitability in that such institutional activity indicates an enhanced ability to
14           function within the law upon release.  Cal. Code Regs., Title 15 s.
             2402(d)(9).  Petitioner had participated in correspondence school.  Ex. D,
15           p. 51.  Ex. C, p. 8, 10, 12.  In the present case, the Board recognized
             petitioner's efforts to disassociate himself from his prior gang
16           involvement.  Ex. B, p. 13; Ex. D, p. 60-61, 87) and his pursuit of his bible
             studies.  Ex. D, p. 93-94.  The Board recognized the gains he made
17           towards obtaining an AA degree.  Ex. D, p. 96, 101.  *Otherwise there was
             no evidence on the record before the Board to show that petitioner had
18           taken any other course or programmed in any other fashion.  Ex. D, p. 84.*

19   (Dkt. 9-3, at 8 (emphasis added)).

20          As discussed above, the BPH did not find petitioner unsuitable based on his

21   failure to participate in self-help programs.  In fact, in its decision, the BPH commended

22   petitioner for his positive programming:

23          Again, realizing that only you are going to get yourself out of this – this
             prison, you started programming.  You started getting your vocations.
24           You started working on what ultimately came to be your – your focus in
             life and that hopefully is your commitment to your religion, and you've
25           done a lot of work on that, a man coming from as little educational
             background as you have are on the threshold of possibly getting an AA
26           degree.  We're going to encourage you to get those last four units.  We

                                                    19

1  believe that's within your reach. We're not going to make it a requirement,
   but we think that that would be a very good thing for you to do.
2

3  (Dkt. 9-2, at 61 of 115.)

4         Moreover, the page cited by the Superior Court in support of its finding that

5  petitioner had not adequately programmed, i.e. page 84 of the transcript from the 2008 hearing, is

6  from the statement by Deputy District Attorney Waddell who appeared at the hearing to oppose

7  petitioner's release.  At page 84 of the transcript, Deputy District Attorney Waddell stated that

8  "[h]e has, to his credit, upgraded vocationally and recently in the small engine repair program.

9  The silk screening then goes back a while . . ." (Dkt. 9-2, at 84.)  Deputy District Attorney

10 Wadell went on to acknowledge petitioner's academic achievements but went on to argue, "[h]e

11 could expand, I think, his self-help to other courses other than just AA and the bible

12 correspondence course."  (Id.)  In finding that petitioner had not adequately programmed, the

13 Superior Court apparently improperly relied on the District Attorney's argument that petitioner

14 should be required to participate in more programming.

15        As discussed above, the BPH did not find that petitioner was unsuitable for parole

16 based on inadequate programming.  Because this was not a ground relied on by the BPH in

17 finding petitioner unsuitable, the Superior Court was not entitled to rely on it.  Hatcher v. Carey,

18 supra.

19        The Superior Court next found that "[t]he area of concern for the Board was that

20 alcohol abuse was involved in the commitment offense."  (Dkt. 9-3, at 8 of 12.)  The Superior

21 Court went on to find that petitioner's participation in AA was inadequate:

22        Given this casual connection there was some evidence to support the
          Board's concern with the petitioner's limited involvement in substance
23        abuse treatment in prison. Ex. D, p. 97. Since his incarceration petitioner
          had only sporadically attended Alcoholics Anonymous program until
24        between 2005 and 2008 when he upgraded his commitment to Alcoholics
          Anonymous.  Ex. C, p. 8, 10, 12, 14; Ex. E, p. 7; Ex. D, p. 52-54, 84.
25        Despite petitioner's rehabilitative gains derived from his bible studies,
          petitioner's gains in addressing his own substance abuse issue were
26        relatively recent.  By his own account, it had only been six or seven years

                                        20

since he decided to turn his life around while in prison.  Ex. D, p. 65-66, 85.

The Board observed that the petitioner also failed to identify the Alcoholics Anonymous program in the area that he was going to live.  Ex. D, p. 99.  On June 18, 2008 the psychological evaluator diagnosed petitioner as suffering from "alcohol dependence with physiological dependence in a controlled environment and amphetamine abuse."  Ex. D, p. 57; Ex. E, p. 8.  The evaluator concluded that the petitioner posed a low risk of recidivism for violent behavior.  Ex. E, p. 11-12.  The evaluator however emphasized that the petitioner's ongoing involvement in an established 12 step program such as AA was critical in order for him to maintain his sobriety.  Ex. D, p. 59; Ex. E, p. 12.  It was critical to his ability to maintain an "overall pattern of pro-social conduct in the community."  Ex. E, p. 9.

The Board in turn recommended that the petitioner establish spiritual residency with a church that offers a 12 step program.  Ex. D, p. 98.  The record supports this recommendation.  In terms of his plans to maintain his sobriety, the petitioner had "put great reliance on his Christian faith and associated support programs available to him in the community."  Ex. E, p. 5.  However, petitioner did not have an AA sponsor in the community.  Petitioner had investigated the availability of substance abuse programs that required a monetary fee for participation in the program rather than programs offered through Alcoholics Anonymous which do not charge a fee.  Ex. D, p. 75, 98.

Accordingly, there was some evidence to support the Board's conclusion that the petitioner would benefit from consistent involvement in substance abuse programming while both incarcerated and upon release given that the use of alcohol was related to the murder and to some of his prior violent criminal misconduct.

(Dkt. 9-3, at 8-10 of 12.)

As discussed above, the BPH did not find petitioner unsuitable for parole on grounds that he had not adequately participated in AA or other drug and alcohol programs while in prison.  Because this was not a ground relied on by the BPH in finding petitioner unsuitable, the Superior Court was not entitled to rely on it.[1]  Hatcher v. Carey, supra.

The Superior Court also found that the BPH properly found petitioner unsuitable

---

[1]  Attached to the 2008 Life Prisoner Evaluation were documents indicating that petitioner had perfect AA attendance in 2005, 2006 and 2007.  (Dkt. No. 9-1, at 76, 78, 79.)  The psychological report did not state that petitioner required additional alcohol or drug treatment before being released on parole.  (Dkt. No. 9-2, at 70-82.)

1  for parole because he had not adequately investigated AA programs in Contra Costa County.

2  (Dkt. 9-3, at 9 of 12.)  As discussed above, petitioner's failure to obtain a list of AA meetings in

3  Contra Costa County was not "some evidence" of his current dangerousness.  This finding by the

4  Superior Court was an unreasonable application of clearly established Supreme Court authority.

5         Finally, the Superior Court stated that the BPH  found petitioner unsuitable based

6  on his attitude toward the offense.  (Id., at 10 of 12.).  In particular, the Superior Court cited a

7  portion of the psychological report stating that petitioner's insight into his offense was limited.

8  (Dkt. 9-2, at 76.)  The Superior Court found that petitioner's lack of remorse rendered him

9  unsuitable.  (9-3, at 10 of 12.)

10        During the hearing, the BPH discussed this portion of the psychological report:

11             However, you reiterated that you thought that your claim of self-defense
               should have served to reduce your culpability in this offense and there
12             reduce the severity of your sentence, and I'm on page 7 of the report.  The
               doctor said nonetheless, you indicated you are resigned to your conviction
13             and sentence and you just hope that you can attain parole and in this
               regard, he said that you exhibited minor frustration and discouragement
14             that in your view previous Board Panels have not appeared to consider the
               changes that you've made in your life and primarily becoming a new man
15             through your Christian faith...

16  (Dkt. 9-2, at 21 of 115.)

17        While the BPH acknowledged the portion of the psychological report cited by the

18  Superior Court, it did not find petitioner unsuitable on grounds that he lacked insight or failed to

19  show adequate remorse.  In fact, the BPH found that the psychological report was favorable.  (Id.,

20  at 61-62.)  Because the BPH did not find petitioner unsuitable based on a lack of insight or

21  remorse, the Superior Court was not entitled to rely on these grounds.  Hatcher v. Carey, supra.

22        For the reasons discussed above, the undersigned finds that the Superior Court's

23  opinion upholding the 2008 BPH decision finding petitioner unsuitable for parole was an

24  unreasonable application of clearly established Supreme Court authority.  "Some evidence" did

25  not support the BPH decision that releasing petitioner would pose a danger to the community.

26  As discussed above, petitioner's criminal history and commitment offense were no longer

probative of whether petitioner remained a danger to the public if released on parole.  Rather, the evidence demonstrated that petitioner met the criteria for parole.  Accordingly, the undersigned recommends that the petition be granted.[2]

Accordingly, IT IS HEREBY RECOMMENDED that:

1.   Petitioner's application for a writ of habeas corpus be granted;

2.   The California Board of Parole Hearings be directed to set a parole date for petitioner within thirty days of the date of the adoption of these findings and recommendations.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any response to the objections shall be filed and served within fourteen days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

DATED:  October 7, 2010

KENDALL J. NEWMAN
UNITED STATES MAGISTRATE JUDGE

mon362.157

_____

[2]  Interestingly, petitioner apparently still has not been paroled despite, as noted above, the BPH expressly noting that it was ordering a one year denial (Dkt. No. 9-2, at 62-63). Accordingly, the recommendation that the petition be granted assumes petitioner's record remains substantially unchanged from the time of the 2008 hearing.

23